UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RICHARD STARKEY et al.,

                         Plaintiffs,

        v.

CAPSTONE ENTERPRISES OF
PORTCHESTER et al.,

                         Defendants.

---

Case No. 06-CV-1196 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances</u>:

Gerard A. Falco, Esq.
Harrison, New York
*Counsel for Plaintiffs*

R. Paul McTiernan, Esq.
Barry, McTiernan & Moore
New York, New York
*Counsel for Defendants Capstone Enterprises of*
*Portchester, Inc. and Capstone Enterprises*

Stewart B. Greenspan, Esq.
Rubin Fiorella & Friedman
New York, New York
*Counsel for Glenman Industrial & Commercial Contractor*
*Corp. and Glenman Construction Corporation*

Lori D. Fishman, Esq.
Christopher C. Caiazzo
Law Office of Lori D. Fishman
Tarrytown, New York
*Counsel for JMOA Engineering, P.C.*

KENNETH M. KARAS, District Judge:

Plaintiffs Richard Starkey and Michelle Starkey (collectively, "Plaintiffs") bring this

negligence action against Defendants Capstone Enterprises of Portchester, Inc. and Capstone

Enterprises (collectively, "Capstone"); Glenman Industrial & Commercial Contractor

Corporation and Glenman Construction Corporation (collectively, "Glenman"); and JMOA

Engineering, P.C. ("JMOA").[1]  The Complaint alleges that because of Defendants' negligence

and failure to provide a safe work environment, Plaintiff Richard Starkey ("Richard Starkey")

suffered physical injury, lost earnings, sustained damage to the quality of his life, and incurred

medical expenses, and Plaintiff Michelle Starkey ("Michelle Starkey") was deprived of the

services, society, and consortium of Richard Starkey.[2]

Between December 29, 2006, and January 2, 2007, Capstone, Glenman, and JMOA each

moved for summary judgment on Plaintiffs' claims.  (Dkt. Nos. 39, 43, 54.)  On December 31,

2006, Plaintiffs cross-moved for summary judgment against Capstone on its claims based on

New York State Labor Law § 240(1) and § 241(6).  N.Y. Lab. Law § 240(1) (McKinney 2008)

("Section 240(1)");  N.Y. Lab. Law § 241(6) (McKinney 2008) ("Section 241(6)").  (Dkt. No.

50.)[3]  For the reasons stated below, JMOA's Motion for Summary Judgment is granted in part,

---

[1]Plaintiffs and Defendants have dismissed all claims, cross-claims, and counterclaims against Barfar Equipment Corporation, a named Defendant in the original Complaint.  (Dkt. No. 34.)

[2]This case was originally filed in New York Supreme Court.  On February 15, 2006, Defendant Barfar Equipment Corporation removed the case to this Court pursuant to 28 U.S.C. § 1441, noting that each Defendant – Capstone (New York), Glenman (New York), JMOA (New York) and Barfar (Massachusetts) – haled from a different state than Plaintiffs (Connecticut). (Dkt. No. 1.)

[3]This case was reassigned to this Court on August 6, 2007.

and denied in part; Glenman's Motion for Summary Judgment is granted in part and denied in part; Capstone's Motion for Summary Judgment is granted in part and denied in part; and Plaintiffs' Motion for Summary Judgment as to Defendant Capstone is granted.

## I. Background

### A. The Accident

This case concerns a workplace accident – the basic facts of which are not in dispute. On January 15, 2003, Plaintiff Richard Starkey was working on a construction project at the Irvington Campus of the Irvington Union Free School District ("the School District"). (Joint Pre-Trial Order ("JO") 4 ¶ 26.) Richard Starkey was at the Irvington Campus as an employee of Zodiac Industries ("Zodiac") (*id.* 4 ¶ 25), a company that specializes in work involving sheet metal for heating and air conditioning units (Pasqualini Dep. 6). At approximately 7:20 a.m on the morning of January 15, 2003, Richard Starkey was directed by his supervisor, Peter Pasqualini ("Pasqualini"), to help install some ductwork for a temporary heating unit. (*Id.* 4 ¶ 26.) In order to perform the work, Richard Starkey required the use of a ladder. (*Id.*) Richard Starkey made use of a "Little Giant" type 1A adjustable ladder that had already been set-up in the area. (*Id.* 4 ¶¶ 26-28.) Richard Starkey was climbing the ladder and carrying a section of ductwork when one of the side rails of the ladder failed, collapsing the ladder and causing Richard Starkey to fall several feet to the ground. (*Id.* 4 ¶¶ 29; Starkey Dep. 33-34.) As a result of the fall, Richard Starkey suffered severe damage to his leg and ankle. (Starkey Dep. 46.)

The Parties do not dispute that Richard Starkey fell from the ladder, that he fell because the ladder failed, or that as a result of the fall he was injured. Nor do the Parties contest that the collapse of the ladder constitutes a violation of Sections 240(1) and/or 241(6) of New York

Labor Law.  Rather, the dispute in this case centers on which entities – which contractors, owners, or managers – bear legal responsibility for his fall.  Accordingly, the facts most relevant to this case concern not the fall itself, but rather the roles played by the Defendants on the Irvington Campus job site.

### B.  The Individual Defendants

#### 1.  JMOA

 On or about September 15, 1999, JMOA entered into a contract with the School District to serve as the construction manager of the Irvington Campus job site.  (JO 2 ¶ 8.)  JMOA was a prime-contractor, which means that it contracted directly with the owner of the project, the School District.  According to Joseph Samela ("Samela"), an employee of JMOA who served as a supervisor on the project, a construction manager "does a daily report on the progress of the project that's going on, reviews the drawings, holds construction meetings, take[s] photos [of] the progress of the project[,] and reports back to the owner with updates . . . ."  (Samela Dep. 12.)

#### 2.  Glenman

Glenman, like JMOA, was a prime contractor operating at the Irvington Campus.  (JO 3 ¶ 13; Samela Dep. 12-13.)  Glenman served as the general contractor of the work site.  (Samela Dep. 13; Ragusa Dep. 18; Conneally Dep. 5; Pasqualini Dep. 12).  According to John Russo ("Russo"), who served as a construction superintendent for Glenman at the time of the accident (Russo Dep. 8), Glenman was responsible for basic supervision and protection of the project (*id.* 17).  Glenman had contracts with multiple subcontractors, including those subcontractors handling masonry, drywall, and structural steel.  (*Id.* 12.)  In addition, anything that fell through

the cracks would be taken care of by Glenman. (*Id.* 17.)

Glenman was also responsible for overall worker safety on the job site (Samela Dep. 17, 48), and filed a "health and safety plan" with the School District (JO 3 ¶ 17). According to both Samela and Russo, Glenman was responsible for the worker safety of both Glenman's own subcontractors as well as the other prime contractors on the job site. (Samela Dep. 21; Russo Dep. 36.) Glenman would fill out accident reports for any injured party, whether or not they were a subcontractor of Glenman. (Russo Dep. 29.) According to Samela, this sort of responsibility was typical of that owed by the general contractor, even when there were other prime contractors on the same site. (Samela Dep. 48.)

### 3. Capstone

Capstone, like JMOA and Glenman, was a prime contractor at the Irvington Campus job site. (JO 3 ¶ 12; Conneally Dep. 8.) Its agreement with the School District called on Capstone to provide goods, labor, and services relating to the installation of the heating, ventilation, and air conditioning ("HVAC") units. (JO 3 ¶ 12.) According to Michael Ragusa ("Ragusa"), Capstone's foreman on the Irvington Campus job site, Capstone subcontracted out nearly all of the work called for in its contract with the School District to various subcontractors, including Zodiac. (Ragusa Dep. 11-12.) Accordingly, Ragusa was Capstone's lone employee present on the job site. (*Id.* 11.)

Zodiac, unlike JMOA, Glenman, and Capstone, was not a prime contractor – its contract was with Capstone, not the School District.  (JO 3 ¶ 18; Pasqualini Dep. 7.)  Zodiac was hired by Capstone to install the ductwork for HVAC units.  (Ragusa Dep. 12.)  This subcontractor relationship was authorized by the terms of Capstone's agreement with the School District.  (JO 3 ¶ 19.)[5]  Richard Starkey was an employee of Zodiac, and the ladder at the center of his accident was owned by Zodiac, and put in place by a Zodiac employee.  (*Id.* ¶¶ 27-28.)

### C.  Installation of the Temporary Heating Unit

On January 14, 2003, Zodiac began to install ductwork for a temporary heating unit at the theater/arts building on the Irvington Campus.  (*Id.* 4 ¶ 21.)  The installation of this component, however, was not part of Capstone's original written agreement with the School District.  (*Id.* 4 ¶ 22.)  As a result, the temporary heating unit was billed by Capstone to the School District as "New Construction Change Order #1."  (*Id.* 4 ¶ 24.)

Although the temporary heating unit was installed by Zodiac and billed by Capstone to the School District, there is some dispute about who initiated and controlled this aspect of the construction.  According to Samela, a JMOA supervisor, JMOA "called in" the contract for the temporary heating unit.  (Samela Dep. 51.)  JMOA chose Capstone/Zodiac to do the duct installation for the temporary heating unit, just as it chose Talk Electric – another contractor on

---

[4]Zodiac was not named as a defendant in this case by Plaintiffs.  On April 13, 2006, however, Capstone filed a Third-Party Complaint against Zodiac.  (Dkt. No. 13.)  As of the date of this Opinion and Order, Zodiac has not responded to the Third-Party Complaint, nor made an appearance in this case.

[5]Capstone's obligations regarding safety of its contractors and subcontractors were governed by Article 10 of the A201 General Conditions.  (JO 4 ¶ 20.)

site – to do the electrical connections. (*Id*. 24-25, 51-52.) JMOA told Capstone/Zodiac, among others, that if they did the work for the temporary heater, the change order would be approved. (*Id*. 51-52.) According to Samela, JMOA discussed the installation of the heating unit with Capstone (*id*. 27), but did not, however, direct its installation (*id*. 26).

Glenman's involvement in the installation of the temporary heating unit is also somewhat obscured. Samela, the JMOA supervisor, did not believe that Glenman had any particular role in the installation of the heating unit. (*Id*. 27.) According to Russo, Glenman's construction superintendent, Glenman did not play a role in handling the costs of the temporary heating unit, but it was involved in discussions regarding the implementation and installation of the duct work for the heating unit. (Russo Dep. 20.) Russo stated that he was personally involved in the installation of the temporary heater in order to make sure that the duct work "was run exactly how we wanted to minimize . . . having to move it later." (*Id*. 42.) According to Russo, this involvement was typical of the type of coordination that Glenman would do. (*Id.*) Russo didn't recall whether he and Samela ever discussed the duct work for the temporary heating unit, but opined that they "could have." (*Id*. 32.)

Pasqualini, the owner of Zodiac, believed that Capstone was acting on behalf of Glenman – and John Russo in particular – when it asked Zodiac to install the temporary heating ducts. (Pasqualini Dep. 9, 64.) According to Pasqualini, "Glenman asked us to – asked Capstone to hook up temporary heat, which, you know, Capstone asked us to do it, because we were a sub." (*Id*. 8.) Pasqualini understood Glenman and JMOA to be the authorities over Capstone. (*Id*. 76-77.)

## II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir. 2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The materiality of the facts is governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the court is not charged with weighing the evidence and determining its truth, but only with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990); *see also Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006).

The Court's goal should be "to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp.*, 477 U.S. at 323-24.

B.  Analysis of Plaintiffs' Claims

Plaintiffs bring claims under three separate provisions of the New York Labor Code: Section 240(1); Section 241(6); and N.Y. Lab. Law § 200(1) (McKinney 2008) ("Section 200(1)").  Defendants JMOA, Glenman, and Capstone have separately moved for summary judgment on Plaintiffs' claims under each provision.  Plaintiffs, in turn, have moved for summary judgment on their claims against Capstone under Section 240(1) and 241(6).  The Court will discuss the pending motions below.

1.  Section 240(1) of New York State Labor Law

Section 240(1) of the New York State Labor Law states in relevant part:

> All contractors and owners and their agents . . . in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, *ladders*, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

N.Y. Lab. Law § 240(1) (McKinney 2008) (emphasis added).  Liability under Section 240(1) has two elements:  a statutory violation and proximate cause.  *See Blake v. Neighborhood Hous. Servs. of New York City, Inc.*, 803 N.E.2d 757, 761 (N.Y. 2003) (noting that liability under Section 240(1) is "contingent on a statutory violation and proximate cause"); *Panek v. County of Albany*, 788 N.E.2d 616, 619-20 (N.Y. 2003) (noting that Section 240(1) "imposes absolute liability on owners, contractors and their agents for any breach of the statutory duty that proximately causes a plaintiff's injury").  Contractors and owners are *absolutely liable* for

injuries caused by violations of Section 240(1). *See Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 224 n.2 (2d Cir. 2006) (citing *Blake*, 803 N.E.2d at 760-61).

Section 240(1) is aimed at protecting workers by "impos[ing] the responsibility for safety practices on those best situated to bear that responsibility." *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 618 N.E.2d 82, 85 (N.Y. 1993) (citing *Zimmer v. Chemung County Performing Arts*, 482 N.E.2d 898, 901 (N.Y. 1985)); *see also Russin v. Louis N. Picciano & Son*, 429 N.E.2d 805, 807 (N.Y. 1981) (noting that Section 240(1) was revised "to shift responsibility for construction site injuries from those parties without control of the injury producing activity to the general contractor and owner."). The New York Court of Appeals has made it clear that Section 240 is to be construed liberally, *Ross*, 618 N.E.2d at 85, and that owners and contractors may be held liable under Section 240(1) "regardless of whether they exercise supervision or control over the work," *Blake*, 803 N.E.2d at 761; *see also Madeira*, 469 F.3d at 224 n.2 (noting that under Section 240(1), plaintiff could pursue absolute liability claims against his direct employer, the development's general contractor, and the owner of the construction site); *Ross,* 618 N.E.2d at 85 ("It is by now well established that the duty imposed by Labor Law § 240(1) is nondelegable and that an owner or contractor who breaches that duty may be held liable in damages regardless of whether it has actually exercised supervision or control over the work.").

### a. JMOA

JMOA was hired by the School District to serve as the construction manager of the Irvington Campus job site. (JO 2 ¶ 8.) "While a construction manager is generally not considered a 'contractor' or 'owner' within the meaning of § 240(1) or § 241 of the Labor Law, '[t]he label of construction manager versus general contractor is not necessarily determinative.'"

*Lodato v. Greyhawk N. Am., LLC*, 834 N.Y.S.2d 242, 245 (App. Div. 2007) (citing *Walls v. Turner Constr. Co.*, 831 N.E.2d 408, 410 (N.Y. 2005)). "A construction manager 'may be vicariously liable as an agent of the property owner for injuries sustained under the statute in an instance where the manager had the ability to control the activity which brought about the injury.'" *Id.* (quoting *Walls*, 831 N.E.2d at 410)); *see also Nienajadlo v. Infomart New York, LLC*, 797 N.Y.S.2d 504, 505 (App. Div. 2005) ("Liability for violations of Labor Law §§ 240(1) and 241(6) may be imposed against contractors and owners, as well as parties who have been delegated the authority to supervise and control the work such that they become statutory agents of the owners and contractors."). Accordingly, "[a] construction manager charged with the duty of coordinating all aspects of a construction project is a contractor with nondelegable duties under sections 240 and 241 of the Labor Law." *Nienajadlo*, 797 N.Y.S.2d at 505 (internal quotation marks omitted)).

Here, the evidence before the court raises a triable question of fact as to the extent of JMOA's authority over the work of Capstone and Zodiac. According to Samela, the JMOA supervisor, JMOA dealt with all the various contractors – both the prime contractors and the subcontractors – on a daily basis. (Samela Dep. 15.) A JMOA supervisor would walk the job site, checking to ensure that the individual contractors were in compliance with the project drawings. (*Id. 1*6.) If the work was not in compliance with the drawings, the JMOA representative would talk with the relevant foreman and "explain to them that you are doing it wrong, you got to comply or we have to sit down and have a meeting." (*Id.*)

The image of JMOA described by Samela – that of a coordinator with authority to direct the other prime contractors – is mirrored in the testimony of others. According to Russo,

Glenman's construction superintendent, JMOA typically had the task of coordinating among the many co-prime contractors (Russo Dep. 40, 42), a task that was often shared by Glenman, depending on the circumstances (*id.* 43). Russo stated that he and Samela would often talk about "coordination issues ongoing at the site, where work was going, who needed to be where, why and how. Things of that nature." (*Id.* 32.) Thomas Connaelly, the owner of Glenman, says that JMOA "ran the project." (Connaely Dep. 11.) According to Michael Ragusa, the Capstone foreman, JMOA handled coordinating duties (Ragusa Dep. 17), and was the entity to call regarding safety problems (Ragusa Dep. 29). Pasqualini, owner of Zodiac, described JMOA as "look[ing] out for the owners . . . they make sure things are getting done, and they're constantly telling you, get this done; get this done; get this done." (Pasqualini Dep. 16.) According to Pasqualini, "Samela [from JMOA] would just come up and say, You got to get to this building; you need more men; you got to do this, you got to do that. I'd yes him to death and walk away." (*Id.* 17.)

Taken in its entirety, the testimony indicates that JMOA may have exerted its oversight authority in the construction of the duct work for the temporary heating unit. Samela, the JMOA supervisor, testified that JMOA "called in" the contract for the temporary heating unit (Samela Dep. 51), and chose Capstone/Zodiac to do the duct installation (*id.* 24-25, 51-52). JMOA then told Capstone/Zodiac that if they did the work for the temporary heater, the change order would be approved. Although it does not appear that JMOA physically directed the installation of the temporary heating unit (*id.* 26), Plaintiffs have raised an issue of fact over whether JMOA was acting as an agent of the owner in coordinating the construction of the temporary heating unit. Accordingly, JMOA's motion for summary judgment on Plaintiffs' Section 240(1) claim is

denied.  *See Pino v. Irvington Union Free Sch. Dist*., 843 N.Y.S.2d 133, 135 (App. Div. 2007)

(holding that JMOA was "vicariously liable as an agent" of the School District in a similar case

based on an accident at the Irvington Campus); *Olney v. Ciminelli-Cowper Co.,* 670 N.Y.S.2d

142, 143 (App. Div. 1998) ("Where there is no evidence that a construction manager had the

authority to supervise, direct, or control the injury-producing work, he may not be held liable as

the owner's agent.  However, here there are triable issues of fact whether [defendant], the

construction manager, had sufficient authority and responsibility over the project to be held

liable for the alleged violations of section 240(1) of the Labor Law." (internal quotation marks

and citations omitted)).

### b.  Glenman

Glenman provided "general construction services" at the Irvington Campus.  (JO 3 ¶ 13.)

Glenman was not, however, Capstone's direct employer – like Capstone, Glenman was a prime

contractor, employed directly by the School District.  (*Id*. 3 ¶¶ 13-14.)  Generally speaking, the

law draws a distinction between general contractors and prime contractors for general

construction.  *See Chavez v. Jordan-Elbridge Cent. Sch. Dist*., 765 N.Y.S.2d 565, 566 (App. Div.

2003).  This distinction is based on the recognition that while a general contractor has authority

over the various subcontractors at a job site, a prime contractor for general construction does not

typically have authority over the other prime contractors.  *Id.*  "A general contractor will be held

liable under [Section 240(1)] if it was responsible for coordinating and supervising the entire

construction project and was invested with a concomitant power to enforce safety standards and

to hire responsible contractors.  The mere status or designation of general contractor, however,

does not establish liability."  *See Kulaszewski v Clinton Disposal Servs*., *Inc.*, 707 N.Y.S.2d 558,

560 (App. Div. 2000)).  Accordingly, a prime contractor for general construction can be held liable under Section 240(1) only if it "'delegated work in such a manner that it stands in the shoes of the owner or general contractor with the authority to supervise and control the work.'" *Id.* (quoting *Walsh v. Sweet Assocs, Inc.*, 577 N.Y.S.2d 324, 327 (App. Div. 1991)).  "A key criterion to this delegation is the authority to insist that proper safety practices are followed and the right to control work in light of such authority."  *Walsh*, 707 N.Y.S.2d. at 327.

Here, as with JMOA, Plaintiffs have raised an issue of fact as to Glenman's authority over the construction in question.  Like JMOA, Glenman did not have a contractual relationship with Capstone.  (Russo Dep. 13.)  Instead, Glenman was the general contractor of the general trades (Conneally Dep. 7), and hired the subcontractors handling masonry, drywall, and structural steel (Russo Dep. 12).  However, like JMOA, the record suggests that Glenman exerted authority over the various other prime contractors at the job site.

According to Pasqualini, because Zodiac worked for Capstone, it did not officially take orders from Glenman. (Pasqualini Dep. 23 ("I don't do nothing unless Capstone says, because we don't work for Glenman.").)  However, when asked who instructed him to install the temporary duct work, Pasqualini said Capstone had given the instructions – on behalf of Glenman:

> Q:    Who, if anybody, told you to run [the ductwork] to the gym?
>
> A:    It would have to be Capstone.  I mean, Glenman also said, you know, this is what has to be done.  They're a GC. They'll tell me what has to be done.  I'll always go over it with Capstone.
>
> . . .

> A: Glenman asked us to – asked Capstone to hook up temporary heat, which, you know, Capstone asked us to do it, because we were a sub."

(*Id.* 9, 25.) Pasqualini further stated that John Russo, Glenman's construction superintendent, had asked Zodiac to install the temporary heating unit. (*Id.* 64.) This recollection accords with that of Russo himself, who stated that he was personally involved in the installation of the temporary heater in order to make sure that the duct work "was run exactly how we wanted to minimize . . . having to move it later." (Russo Dep. 42.)

Pasqualini's testimony regarding Glenman's role in the construction of the temporary heating unit also is consistent with the general picture he painted regarding Zodiac's relationship with Capstone and Glenman: Zodiac worked for Capstone, but Zodiac understood Glenman to be Capstone's superior, and thus capable (to some extent) of directing Zodiac's actions:

> Q: Did you have any relationship directly with Glenman.
>
> A: Yes and no. I mean, nothing like I worked for them. But when we needed stuff done, they were the GC. You did ask them to do things for you. You would ask JMOA to do things for you. You'd ask anybody to do things for you to get things done. Whether they would do it or not is another story.
>
> Q: Did Glenman ever tell you, or direct your company, Zodiac, to do anything on the job site?
>
> A: Yeah. They all – Glenman, JMOA. They would try to, you know.
>
> Q: Did you follow their instructions or did you follow – whose instructions did you follow?
>
> A: If it cost money, I didn't follow their directions. If there was something I could do for them, I would follow their directions.

Q:      What would happen if they told you to do something and you just didn't do it?

A:      They would go to Capstone.

Q:      And Capstone would direct you or not direct you to do the work?

A:      Yup. . . .

. . .

Q:      So, to your knowledge, who were the people or organizations that had authority to direct you to do something?

A:      Capstone was the only person with authority to tell us to do something.  I mean, JMOA is the project manager.  They got authority to say whatever they w[a]nt on the job.  But when it comes down to, you know, an extra, it has to come from Capstone.

Q:      Did Glenman, to your knowledge, at any time, try to direct Zodiac employees in the construction of the temporary heating system?

A:      To do the work?

Q:      Yes.

A:      Yeah.  They would tell us to do it.  We need it done; let's go.  You know.

(*Id.* 70-73.)

Although Glenman – like JMOA – did not directly employ Capstone or Zodiac, the

deposition testimony of Pasqualini and Russo raises a question of fact as to whether Glenman

had the "authority to supervise and control" the work of Capstone and Zodiac in regard to the

installation of the temporary heating unit.  *Kulaszewski*, 707 N.Y.S.2d at 560 (internal quotation

marks omitted).  Accordingly, Glenman's motion for summary judgment on Plaintiffs' 240(1) claim is denied.

### c.  Capstone

As noted above, JMOA, Glenman, and Capstone each worked directly for the School District – not for each other – with Zodiac serving as a subcontractor of Capstone.  Despite the lack of privity between Zodiac and either JMOA or Glenman, the deposition testimony indicates that JMOA and/or Glenman may have exerted sufficient authority over Capstone and Zodiac to render them liable under Section 240(1).  Accordingly, the Court has denied the summary judgment motions of both JMOA and Glenman in regard to Plaintiffs' Section 240(1) claim.

Capstone's relationship to Zodiac, however, is not analogous to that of JMOA or Glenman.  Zodiac was Capstone's subcontractor, hired to handle the installation of the duct work required of Capstone by their contract with the School District.  (JO 3 ¶ 18.)  The Court has analyzed the specific interactions between Zodiac and JMOA/Glenman because the latter entities' liability ultimately depends upon whether they may be properly considered contractors of Capstone/Zodiac or agents of the owner.  The Court, however, has no equivalent doubt about Capstone's role in regard to Zodiac – Capstone was Zodiac's contractor, and Zodiac took its marching orders from Capstone.

Capstone argues that it was Glenman that actually directed Zodiac to install the temporary heating unit, and as a result, the Court should grant summary judgment for Capstone.  (Def. Capstone's Mem. of Law in Supp. of their Mot. for Summ. J. 3.)  This argument is without merit.  Although, as previously noted, there is support in the record for Glenman's involvement in the installation of the temporary heating unit, the same deposition testimony that points to

Glenman's involvement also highlights Capstone's involvement as the direct contractor of Zodiac. (Pasqualini Dep. 9 ("Glenman asked us to – asked Capstone to hook up temporary heat, which, you know, Capstone asked us to do it, because we were a sub."); *Id.* 25 ("It would have to be Capstone [that told Zodiac to run the duct work]. I mean, Glenman also said, you know, this is what has to be done. They're a GC. They'll tell me what has to be done. I'll always go over it with Capstone.").) Zodiac billed Capstone for the installation of the temporary heating unit, and Capstone, in turn, billed the School District – further underscoring Capstone's direct but not exclusive involvement with the construction. (Pls.' Aff. in Reply to Pls.' Mot. for Summ. J. Ex. B, C.) While the deposition testimony highlighted by Capstone may indicate that Glenman (or JMOA) may *also* be liable under New York Labor Law, the exercise of authority by Glenman or JMOA does not absolve Capstone – the duty imposed on a contractor by Section 240(1) is non-delegable and "an owner or contractor who breaches that duty may be held liable in damages *regardless of whether it has actually exercised supervision or control over the work*." *Ross*, 618 N.E.2d at 85 (emphasis added); *see Nowak v. Smith & Mahoney, P.C.*, 494 N.Y.S.2d 449, 450 (App. Div. 1985) (noting that a contractor's delegation of responsibility under Section 240(1) only serves to "enlarge the class of entities liable" under the statute). Accordingly, Capstone's Motion for Summary Judgment on Plaintiffs' Section 240(1) claim is denied, and Plaintiffs' Cross-Motion for Summary Judgment over Capstone on Plaintiffs' Section 240(1) claim is granted.[6]

---

[6]As noted above, the Parties do not contest that the accident in question constitutes a violation of the New York Labor Law or that the violation caused the accident. Thus, there are no remaining factual disputes regarding Capstone's liability. Obviously, the question of damages will be addressed at trial.

2.  Section 241(6) of New York State Labor Law

Section 241(6) of the New York State Labor Law states in relevant part:

> All areas in which construction, excavation or demolition work is
> being performed shall be so constructed, shored, equipped,
> guarded, arranged, operated and conducted as to provide
> reasonable and adequate protection and safety to the persons
> employed therein or lawfully frequenting such places.  The
> commissioner may make rules to carry into effect the provisions of
> this subdivision, and the owners and contractors and their agents
> for such work . . . .

N.Y. Lab. Law § 241(6) (McKinney 2008).  "In order to make out a prima facie cause of action

under section 241(6), an injured worker must show that a specific regulation of the Industrial

Code was violated, that the regulation applied to the incident at issue and that the violation

proximately caused his injuries."  *Hotaling v. Corning Inc.*, 784 N.Y.S.2d 802, 803 (App. Div.

2004).  The regulation relied upon by the plaintiff "must relate, not to general safety standards,

but to concrete specifications sufficient to impose a duty on the defendant."  *Ryan v. Freidman

Decorating Co.*, No. 01-CV-385, 2005 WL 1802861, at *16 (S.D.N.Y. July 28, 2005); *see also

Ross*, 618 N.E.2d at 87-88 ("Labor Law § 241(6) . . . reiterates the general common-law standard

of care and then contemplates the establishment of specific detailed rules through the Labor

Commissioner's rulemaking authority.").  The specific rule allegedly violated by the defendant –

not the broad duty of care laid out in the opening sentence of Section 241(6) – is the reference by

which the defendant's conduct is measured.  *See Ross,* 618 N.E.2d at 87 (noting that Section

241(6) requires "reference to outside sources to determine the standard by which a defendant's

conduct must be measured").

Like the duty imposed by Section 240(1), an owner or contractor's duty to comply with

the regulations made actionable by Section 241(6) is non-delegable.  *See id.* at 86.  Thus, to the

extent that a plaintiff has asserted a viable claim under Section 241(6), "he need not show that defendants exercised supervision or control over his worksite in order to establish his right of recovery." *Id.* However, unlike liability under Section 240(1), which is absolute, "a breach of a duty imposed by a regulation promulgated under [Section 241(6)] is merely some evidence of negligence." *Id.* at 86 n.4.[7]

Here, Plaintiffs allege that Defendants have violated a specific provision of the New York Code of Rules and Regulations pertaining to the use of ladders and ladderways. The regulation states in relevant part:

> Maintenance and replacement. All ladders shall be maintained in good condition. A ladder shall not be used if any of the following conditions exist:
> (i) If it has a broken member or part.
> (ii) If it has any insecure joints between members or parts.
> (iii) If it has any wooden rung or step that is worn down to three-quarters or less of its original thickness.
> (iv) If it has any flaw or defect of material that may cause ladder failure.

N.Y. Comp. Codes R. & Regs. tit.12, § 23-1.21(b)(3) ("Regulation 23-1.21(b)(3)"). This regulation has been held to be "sufficiently specific to support a cause of action under [Section] 241(6)." *Jicheng Liu v. Sanford Tower Condo., Inc*., 828 N.Y.S.2d 101, 103 (App. Div. 2006); *see also Perry v. City of Syracuse Indust. Dev. Agency*, 726 N.Y.S.2d 311, 311 (App. Div. 2001) (noting that Regulation 23-1.21(b)(3) is sufficiently specific to support a claim under Section 241(6)).

---

[7]There is at least one other key difference between liability under Sections 240(1) and 241(6): contributory and comparative negligence are valid defenses only under Section 241(6). *See Ross*, 618 N.E.2d at 86 n.4. No party to the present case has alleged – explicitly or implicitly – that Richard Starkey was contributorally negligent in the accident. Accordingly, this difference between Sections 240(1) and 241(6) has no bearing on this case.

### a. JMOA and Glenman

The evidence before the Court raises a triable issue of fact in regard to each of the elements of Plaintiffs' 241(6) claim against JMOA and Glenman, including the violation of Regulation 23-1.21(b)(3). *See Fernandes v. Equitable Life Assurance Soc. of U.S.*, 774 N.Y.S.2d 4, 6 (App. Div. 2004) ("Plaintiff's testimony describing the ladder raises an issue of fact as to whether it had broken, insecure or worn down members or parts in violation of [Regulation 23-1.21(b)(3)] and Labor Law § 241(6)."); *De Oliveira v. Little John's Moving, Inc.*, 734 N.Y.S.2d 165, 166-67 (App. Div. 2001) ("It was also error to dismiss plaintiff's section 241(6) claim. Specific standards that would apply here if plaintiff's testimony were credited are found in [Regulation 23-1.21(b)(3)](iv), which provides that a ladder shall not be used '[i]f it has any flaw or defect of material that may cause ladder failure.'"). As with their motions for summary judgment on Plaintiffs' Section 240(1) claim, JMOA and Glenman do not contest the elements of the claim. Rather, JMOA and Glenman argue that they did not have the requisite authority over Capstone/Zodiac to be held liable as a contractor or an agent of the owner. For the reasons already discussed with regard to JMOA's and Glenman's motions for summary judgment on Plaintiffs' Section 240(1) claim, JMOA's and Glenman's motions here fail – Plaintiffs have presented triable issues of fact in regard to each company's authority and control over the installation of the temporary heating unit. Accordingly, JMOA's and Glenman's motions for summary judgment on Plaintiffs' Section 241(6) claim are denied.

### b. Capstone

Like JMOA and Glenman, Capstone does not contest the elements of Plaintiffs' 241(6) claim. Instead, Capstone argues that it cannot be held liable as a contractor because other

entities – namely Glenman – exerted authority over the construction of the temporary heating unit.  For the reasons already discussed in regard to Capstone's motion for summary judgment on Plaintiffs' Section 240(1) claim, this argument is without merit.  Regardless of whether Glenman or JMOA exercised authority over the construction of the temporary heating unit, there is ample, undisputed evidence in the record that Capstone still served as Zodiac's contractor during the pendency of the construction.  Accordingly, Capstone's motion for summary judgment on Plaintiffs' Section 241(6) claim is denied, and Plaintiffs' cross-motion for summary judgment over Capstone on Plaintiffs' Section 241(6) claim is granted.

### 3.  Section 200 of New York State Labor Law

Section 200(1) of the New York State Labor Law states in relevant part:

> All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons.

N.Y. Lab. Law § 200(1) (McKinney 2008).  Section 200(1) "codifies the common law duty of owners and general contractors to maintain a safe worksite."  *Carberry v. Integral Constr. Corp.*, 94-CV-7911, 1997 WL 97841, at *4 (S.D.N.Y. Mar. 5, 1997) (citing *Ross*, 618 N.E.2d at 89).  Unlike liability under Sections 240(1) and 241(6), "[l]iability under § 200(1) and at common law does not attach unless the defendant owner or general contractor exercised 'the requisite degree of supervision and control over the portion of the work that led to [plaintiff's] injury.'"  *Id.* (quoting *Ross*, 618 N.E.2d at 89).  Thus, "a general contractor is not required to protect employees from defects in a subcontractor's equipment or unsafe work practices, except in those

22

instances where the general contractor exercises actual control over the unsafe work place and has actual or constructive notice thereof." *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 743 N.Y.S.2d 630, 631 (App. Div. 2002) (hereinafter *Ross II*); *see also Wilson v. City of New York*, 89 F.3d 32, 38 (2d Cir. 1996) (noting that liability under Section 200 requires that a defendant have "actual or constructive notice of the condition complained of and exercised supervision or control over the work performed by the plaintiff." (internal citations and quotation marks omitted)); *Rapp v. Zandri Constr. Corp.*, 569 N.Y.S.2d 994, 995-95 (App. Div. 1991) ("[T]o establish a valid claim, a plaintiff must show that the parties to be charged with a duty under Labor Law § 200 had control of the site of the injury and notice, actual or constructive, of the unsafe condition" (internal quotation marks omitted)). Accordingly, neither "mere contractual retention of general supervisory power," *Carberry*, 1997 WL 978412, at *4 (collecting cases), nor "mere presence of employees of the general contractor at the work site," *Ross II*, 743 N.Y.S.2d at 631, is sufficient to dictate liability under Section 200(1).

Although, as noted above, Plaintiffs have presented a triable question of fact in regard to the level of authority and control exercised over Zodiac by JMOA, Glenman, and Capstone, Plaintiffs have presented no evidence whatsoever that any of the defendants had "actual or constructive notice" of the defect in the ladder used by Richard Starkey. *See Wilson*, 89 F.3d at 38 (noting that liability under Section 200 requires that a defendant have "actual or constructive notice of the condition complained of"); (Pasqualini Dep. 39 (noting that even the Zodiac employees closest to the accident and equipment were stunned that the ladder, which was protected by a guarantee, buckled under Richard Starkey's weight).) Accordingly, JMOA's,

Glenman's, and Capstone's motions for summary judgment on Plaintiffs' Section 200(1) claim are granted.

C.  Indemnification

Finally, both JMOA and Glenman seek contractual indemnification against the various other defendants in this case, including one another.  As this Court already has held that there are material questions of fact as to whether JMOA and/or Glenman are liable for Plaintiffs' damages, any determination regarding indemnification owed by one to the other (or by Capstone to either party) should await the outcome of trial.  *See, e.g., Pollack v. Safeway Steel Prods., Inc.,* 457 F. Supp. 2d 444, 455 (S.D.N.Y. 2006) ("By the terms of their agreement, [the general contractor] can seek indemnification against [the subcontractor] to the extent that [the subcontractor] is responsible for the acts causing bodily injury.  As there are issues of fact regarding liability, we cannot at this time determine who is at fault for plaintiff's accident.  However, [the general contractor] can raise a claim of indemnification under the terms of its contract."); *Gonzalez v. Southbay Commons, Inc.,* 839 N.Y.S.2d 433 (table), 15 Misc.3d 1117(A), at *8 (N.Y. Sup. Ct. 2007) ("[W]hile [the owner] seeks indemnification based on his contract with [the contractor], it is unclear at this juncture whether [the contractor] was the general contractor and, therefore, responsible of directing, supervising and controlling the work out of which his liability arises.  Therefore, any determination of [the owner's] right to indemnification on either basis against any party would be premature."); *Ordonez v. Brooklyn Tabernacle*, 806 N.Y.S.2d 446 (table), 9 Misc.3d 1102(A), at *12 (N.Y. Sup. Ct. 2005) ("There are triable issues of fact as to the liability of all the parties.  It is premature to determine claims for either common-law or contractual indemnification prior to the determination of the respective

24

fault of the parties for underlying injury."). Accordingly, to the extent that JMOA or Glenman seeks contractual indemnification, those motions are denied with leave to renew after trial.

### III. Conclusion

For the reasons discussed above, JMOA's Motion for Summary Judgment is granted in part, and denied in part; Glenman's Motion for Summary Judgment is granted in part and denied in part; Capstone's Motion for Summary Judgment is granted in part and denied in part; and Plaintiffs' Motion for Summary Judgment as to Capstone's liability is granted. The Clerk of Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 39, 43, 50, 54.)

SO ORDERED.

Dated:      September 29, 2008
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List by ECF:

Gerard A. Falco, Esq.
480 Mamaroneck Avenue
Harrison, NY 10528
(914) 835-4862
Fax: (914) 835-6800
Email: gafsail@aol.com
*Counsel for Plaintiffs*

R. Paul McTiernan, Esq.
Barry, McTiernan & Moore
2 Rector Street
New York, NY 10006
*Counsel for Defendants Capstone Enterprises of
Portchester, Inc. and Capstone Enterprises*

Stewart B. Greenspan, Esq.
Rubin Fiorella & Friedman
292 Madison Avenue, 11th Floor
New York, NY 10017
(212) 953-2381
*Counsel for Glenman Industrial & Commercial Contractor
Corp. and Glenman Construction Corporation*

Lori D. Fishman, Esq.
Christopher C. Caiazzo
Law Office of Lori D. Fishman
303 South Broadway, Suite 435
Tarrytown, NY 10591
(914) 524-5600
*Counsel for JMOA Engineering, P.C.*